May it please the court, counsel, David Lee Partito on behalf of the appellant, Lee Cranmer. I'd like to reserve one minute of my time, if I may. I said in my opening brief that I found the facts of this case disturbing. Upon reflection, I believe this is a disturbing case for three reasons. It's a case in which the legal system failed Dr. Cranmer in three ways. First, his illegal arrest by Sergeant Spellman, an arrest that was accomplished without probable cause and unreasonably. And I think that it's important to distinguish between the fact that there was no probable cause in the case in his arrest and also that it was even clearer that the case, the arrest, was made in contravention of Miranda. There was no Miranda warnings given. He was questioned in violation of his Fifth and Sixth Amendment rights. Despite his request for an attorney, he was held for three hours. And all of that was done also in contravention of the Tucson Police Department's standing orders, all of which is in the record. Let's talk about the probable cause. Certainly. And let me recite just a few things from my reading of the briefs and the record, and you tell me if I'm wrong. At the time your client was arrested, the police had been conducting an investigation into the use of fraudulent credit cards and non-sufficient fund checks, right? That is correct. And that investigation was principally directed at your client's then wife. Is that right? Jeannie Herring, yes. And among the other things they knew, they had learned, one was that some $46,000 in insufficient fund checks had been written to your client and negotiated by him, correct? No, that's not quite correct. What they knew was that five checks totaling approximately that amount of money had been deposited by Ms. Herring into my client's account. Okay. And that your client had self-reported some fraudulent uses of his credit cards, is that right? Well, they were aware, I think through Steve Weaver, who was investigating for Chase Bank, that he had reported fraudulent use of his credit card, and he had contacted the police on a couple of occasions. They would have known that from their own records, presumably, and that he had reported to Prudential Securities a suspicious activity on his mother's trust-to-fund account. So they should have been aware of those and several other fraud reports that he had. Did your client tell anyone from law enforcement that these events were being investigated by the Secret Service and the FBI? There was a phone call. Was there a yes or no to that? The answer is yes. And was the information he gave correct? No, he had been misled by it. It was demonstrably false, wasn't it? I mean, whether he had been given misinformation. It's true. We understand what happened in the epilogue or the final chapter. It turned out that the woman your client was married to, among other things, was a bigotist. That's correct. And that she had been routinely stealing credit cards. Had been from him, from others, yes. And credit card numbers. Absolutely. And not telling him about it. Absolutely. But the police didn't know that at the time they were compiling this information, right? They didn't have specific information, but they certainly had a lot of indications that she was the perpetrator and was probably keeping him in the dark. So what the information they had was $40,000 in checks on insufficient funds deposited in his account. Now, when you consider probable cause, you have to consider the entire picture. It's a holistic approach, of course. And what the police knew a great deal of information besides that. What they did was, when you state it that way, which is how Dr. Rohl stated it, of course, in his order, you've picked.   If you will, you've cherry-picked the most incriminating facts. But there are facts that refute those. For example, the fact that Herring had made deposits into Dr. Kramer's account. They ignored the fact that, first of all, all the deposits were made by her. Second, that. Did they know that? Yes. They would have had those banked off. If somebody makes a deposit, how do you know who's actually making the deposit? Well, you know that the check has been signed by a certain person. It's not unusual for my wife to make deposits to my account. It is unusual if she does it without me knowing it. I don't know that the police have to assume that somebody who purports to be married is ignorant of what his partner is doing. They don't have to assume that, but there were other facts. For example, she was kiting checks. In other words, she was paying a check. She was making a check to cover a check that was a previous bad check. So the $46,000 that was flowing through his account was not a real amount of money. It was a series of kited checks. How does that help you? That helps because it indicates that she who's making these deposits is doing something to hide the fact that she hasn't made an initial deposit or the funds have been taken out, which is very different from putting money into an account and the ill-gotten gains of some other fraudulent activities. What it indicates is that it's one of many indications that the police should have averted to that Dr. Cramer was not aware of what his wife was doing and that she, in fact, was hiding it. Well, if he hasn't figured it out at the time, why should the police have figured it out at the time? I mean, that's really what surprised me the most here. In effect, it seemed to me your client's saying, well, it was okay that I was fooled, but the police should have figured it out, even though he was a lot closer to the situation. Well, he was the one she was actively keeping in the dark, and she was forwarding herself. Well, he succeeded through this point in time. Had succeeded through about the middle of April, and when he began to realize that things were wrong. So why is it wrong that the police hadn't figured it out? If your client, who was married to her or thought he was, couldn't figure it out. Well, they had much more information than he had. They had bank records. They had conducted an investigation. What they hadn't done, however, apparently, was conducted any kind of a background investigation of him. They knew quite a bit of information about her. They knew she was a multi-state offender. They knew she used six different social security numbers. They knew that she was an experienced and practiced fraud feeser. They did not apparently know, from the questions that were asked by Sergeant Spellman, that Dr. Cranmer had an unimpeachable background. Sergeant Spellman asked Dr. Cranmer, are you a real doctor, or suggested he wasn't a real doctor. Had even a rudimentary investigation been done of the relationship between Jeannie Herring and Dr. Cranmer and even a rudimentary investigation but none of his background, it would have become clear that she was the one who was actively perpetrating the fraud. She, after all, was the one who was doing all of these activities. What he was doing was trying, once he realized it was going on or that something was going on, he was making reports to various entities, which is totally inconsistent. When was the first time that your client said to anyone from law enforcement, I have no idea about any of the stuff you're talking about? I don't believe he ever made a statement to law enforcement because he was arrested. How long was he detained? He was detained for three hours. He didn't spend a night in jail? He did not. Well, he was detained for three hours at the Tyconic place. There were several more hours before he was arraigned that day. At some point, the information, do I understand correctly, was laid before a prosecutor? At some point, it was laid before a prosecutor. And the prosecutor said, we're going against the wife, we're not going against the husband. That decision was made at some point. Okay. What fact, if you know, triggered that decision? I don't know the thoughts, but I assume it was many of the things that we've been describing in our briefs and today. The fact that she was the one doing all of the, committing all of the fraud, the fact that she was actively keeping him in the dark, and the fact that she was the one who had the long criminal record and he had no record at all. In fact, this is the beginning of a brilliant medical career. At the point at which the law enforcement agencies laid the potential case out to the prosecutor, was there a particular fact that triggered the decision not to prosecute your client? I don't know the answer to that. So you don't know whether that fact was learned or could have been learned earlier? I don't. But I know that the investigation is certainly largely complete by the time that he was arrested because it was presented to the grand jury about a week or so after that. And it was during the grand jury proceedings that the detective, Detective Leonard, who was the case officer, made the statement that she did not know one way or the other whether Dr. Cramer was involved. I see that I've gone into my last minute. But I do want to point out, as I'm sure the Court is aware, that I do believe the fact that we're discussing this case on an incomplete record is extremely important. And the reason we're doing so is because of the second failure of the system, which was David Beauregard's complete failure to make discovery, to take depositions, or even to bring an expert up to speed. I believe that had that all been done, we would be discussing this on a very different record, and that by itself is an independent grounds for relief. Why doesn't your client's cause for relief lie against him? Well, that's what the Tani case is all about. The Tani case discussed the fact that you might have a malpractice action against your attorney, but that was not an adequate remedy, and that was not the analysis engaged in by the Court. Very different from the analysis engaged in by Judge Roll. I see my time is up. We'll give you a little time for rebuttal if you'd like. Thank you, Your Honor. We'll hear from the defendants at this time. Counsel? Thank you, Your Honor. Is there going to be a division of time here, or are you going to take it all? I'm going to take five minutes. Okay. And Mr. Neal is going to take five minutes. Why don't you put five minutes on the clock so we'll know when he's out of time? My name is Daryl Adelet, and I represent the City of Tucson in the case. I think the case boils down to whether there's probable cause, and that's a legal question for the Court. That's not a jury question. If there were facts supporting probable cause, if those facts were in dispute, then we may need a jury to help sort out those facts. But these facts are not in dispute. Do you know, can you answer the question I asked your opponent, and that is, was there a particular fact that persuaded the prosecuting attorney to move forward with charges against the wife and not the husband? I have a general recollection and a general understanding that there was extensive discussions between Mr. Bjorgard, the former attorney for Mr. Cranmer, and the prosecutor. I'm assuming that a great deal of more information was provided from Mr. Cranmer's perspective to the prosecutor, and that's why he was not prosecuted. But that's a general recollection, and it's not a part of the record. I'm sorry.   No, no, no. At what point in time was the first time that someone was told that your client did not know about much of this apparently illegal activity? I'm sorry. I didn't understand the question. Well, the question was... My client didn't know much about it. No, no, no. Oh, I see. At what point in time was the first time that someone from Mr. Cranmer's side of things said, he doesn't know what's going on here, he doesn't know about this stuff, he's totally unaware of this stuff? I don't know what point in time that occurred, but I can assure you that it occurred well after the arrest. That statement was never made. There's no indication that information was ever given to the police before the arrest. And you're quite right in pointing out that we had him there, wanted to talk to him for three hours. At any point in time, he could have said, I don't know what's going on, I don't know anything. He's not required to. He's not required to. I think that ultimately the facts probably demonstrate that he was duped, and I think ultimately the facts demonstrate that we were duped, but that doesn't destroy probable cause. And the fact that the prosecutor decided not to prosecute him doesn't destroy the probable cause that existed at the time of the arrest. I think that in the latter part of the case where Mr. Leopardito came in and asked for more time and please consider my expert that came in way late, a year late, and his opinions, and Judge Roll basically said, it doesn't matter. He was basically saying in his order, this expert can't create probable cause. This expert can't make probable cause, can't destroy probable cause, excuse me, where it already exists. And that's what he was really saying. You know, I think the concern is that this expert, I think his name was Jerry Goddard, his opinions were not considered. In the final order in this case that Judge Roll wrote, he talked about Jerry Goddard and his report three times. And this is EOR page 49. Judge Roll in his order said, there's no indication the earlier production of this evidence would have changed the outcome of the case. Much of Mr. Goddard's report is argumentative, speculative, and immaterial to the issues at hand. Page EOR 441, he says, further, even if the court took into consideration Mr. Goddard's report, it would not have precluded summary judgment in this case. What those two statements tell us is Judge Roll obviously read the affidavit, or he wouldn't have been able to conclude that the report is argumentative, speculative, and immaterial. And finally, at the very end of his order, he says, Mr. Goddard's report would not have precluded summary judgment in this matter. So the piece that they claim is missing from this case and from consideration in this case by Judge Roll, in fact, was there. It was in front of the judge. And the judge said, basically, it would not have precluded summary judgment. I've run out of time. I think I... Thank you for your argument. Thank you. Mr. Neal. Please support. My name is Kevin Neal, and I represent the co-defendants, or Ticonic, which is a small flight school at an airport outside of Tucson, and Ms. Daly, who is a minority owner in that business. I do believe the critical issue in the case is probable cause. It's been addressed already. What I have to add in my few minutes is that the allegations against Ticonic were never substantiated. We pointed out in our brief that the district court's findings, facts support summary judgment. There was not a clearly erroneous finding as pertains to Ticonic. The theories were the same against the city as they were against Ticonic, but the allegation was that Ticonic, which is, again, a small flight school, is somehow vicariously liable for whatever Officer Spellman did or did not do. In a final analysis, there was no evidence submitted not only in the briefs or the summary judgment briefs, but also when Mr. Goddard's expert report came in or nowhere in the appellate briefs that tie vicarious liability of Ticonic to the actions of Officer Spellman. When we got to the deposition of Dr. Cranmer, Dr. Cranmer, as we pointed out in our brief, I believe it's on pages 12 and 13, refuted most of the counts, if not all of the counts, against Ticonic. The allegations were not supported by his testimony. And he clearly said, as Officer Spellman did, that when he had contact with Mr. Spellman, when Dr. Cranmer had contact with Sergeant Spellman on April 22, 2002 at Ticonic, the officer said to him, I am now wearing the hat as a police officer. I am not your flight instructor. And to allege and claim that there's vicarious liability on that record and a record that's been briefed by the appellants is unsupported. I would also say that it was not an abuse of discretion by the court to deny the post-relief judgment motions filed by the appellant. Again, the report was untimely. The evidence that was critical to the issue of whether there was probable cause or vicarious liability were clear on the record. And nothing new has been submitted at any stage of Ticonic into the vicarious liability claim that was alleged in the complaint. And for those reasons, we think a remand would be inappropriate. Unless you have any other questions, I have nothing to add on behalf of Ticonic. I don't see any. Thank you for coming down this morning. Thank you. Appreciate your argument.  Thank you, Your Honor. Let me just address, I think Ticonic's liability is tied to Sergeant Spelman's activities. He was there at the premises. He can wear more than one hat just because he says he's wearing his police officer hat doesn't mean he's not still there on the payroll at the business premises during business hours answering the phone and holding a criminal suspect there at the premises. So I believe that the issues are identical. It was stated that probable cause is a legal question, yes, but in the context of summary judgment, it is a jury question unless there is no genuine dispute over material fact. The question that's been asked by the Court was, when did Dr. Cranmer say he did not know what was going on? I'd like to point out that, first of all, his actions said that. He made numerous fraud and police reports. And he made two police reports over a period of several months to the very agency that employed Sergeant Spelman. He also told the authorities things that turned out not to be true. But he was trying to get information to the authorities. But the police don't know that. The police know they've received false information from him. How are they supposed to discern that he's also in the dark? I think by the fact that criminals don't normally report their criminal activity to the police, to fraud, to the FBI, to various other entities. And in one of his initial contacts, didn't he tell an investigator that he couldn't talk and gave him the name of a lawyer in South Dakota who turned out not to be a private lawyer but a prosecutor who had never heard of your client? That was when Weaver called him, and that was one of about four or five contacts. He made several contacts on his own. Weaver called him, and he did give that erroneous information. What's the explanation in the record for that? The explanation in the record for the erroneous information. And why did that? I believe that was discussed in Dr. Kramer's deposition, and he did that because he had been told by Jeanne Herring that this lawyer, that she had contacted this lawyer, this lawyer was an old friend, that this lawyer was taking care of things for him and them. Okay. Thank you very much. Thank both sides for their argument. The case disargued will be submitted for decision, and we'll proceed to Kistler Investments versus the Depository Trust and Clearing Corporation.
judges: Hawkins, Thomas, Clifton